SCOTT D. SWEENEY
WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
1225 17th Street, Suite 2750
Denver, CO 80202
Tel: 303.572.5300/Fax: 303.572.5301
scott.sweeney@wilsonelser.com

BRAD D. BRIAN (*Pro Hac Vice Forthcoming*)
brad.brian@mto.com
MICHAEL R. DOYEN (*Pro Hac Vice Forthcoming*)
michael.doyen@mto.com
BETHANY W. KRISTOVICH (*Pro Hac Vice Forthcoming*)
bethany.kristovich@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Tel: 213.683.9100/Fax: 213.687.3702

E. STRATTON HORRES, JR. (*Pro Hac Vice Forthcoming*)
Stratton.Horres@wilsonelser.com
WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
901 Main, Suite 4800
Dallas, Texas 75202
Tel: 214.698.8000/Fax: 214.698.1101

Attorneys for Plaintiffs MGM RESORTS INTERNATIONAL, MANDALAY RESORT GROUP, MANDALAY BAY, LLC, MGM RESORTS FESTIVAL GROUNDS, LLC, and MGM RESORTS VENUE MANAGEMENT, LLC

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**
**SALT LAKE CITY DIVISION**

| | |
|---|---|
| MGM RESORTS INTERNATIONAL, MANDALAY RESORT GROUP, MANDALAY BAY, LLC, MGM RESORTS FESTIVAL GROUNDS, LLC, MGM RESORTS VENUE MANAGEMENT, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>ROBERT EARDLEY LAURA FARTHING, JEN HOLUB, SHEILA KEELE, and KELLI SANCHEZ,<br><br>Defendants. | Civil Action No. 2:18-cv-00567-JNP<br><br>**COMPLAINT FOR DECLARATORY RELIEF** |

## INTRODUCTION

1. On October 1, 2017, Stephen Paddock carried out a mass attack at the Route 91 Harvest Festival in Las Vegas, Nevada.

2. Paddock intended to inflict mass injury, death and destruction. He killed 58 persons and injured some 500 others. Paddock's attack resulted in the highest number of deaths of any mass shooting in the Nation's history.

3. Security for the concert was provided by Contemporary Services Corporation, whose security services have been certified by the Secretary of Homeland Security for protecting against and responding to acts of mass injury and destruction.

4. Recognizing the national interest in such events, and in the development and deployment of services certified by the Secretary of Homeland Security to prevent and respond to such events, Congress has provided original and exclusive federal jurisdiction for any claims of injuries arising out of or relating to mass violence where services certified by the Department were deployed.

5. Plaintiff MGM Resorts Festival Grounds, LLC owns and operates the Las Vegas Village, at 3901 South Las Vegas Boulevard, Las Vegas, Nevada 89119, where the Route 91 Harvest Festival was held. Plaintiff Mandalay Bay, LLC owns and operates the Mandalay Bay resort, which is adjacent to Las Vegas Village. Plaintiff MGM Resorts International is the parent corporation, with an indirect 100% interest in Mandalay Bay, LLC, and MGM Resorts Festival Grounds. Plaintiff MGM Resorts Venue Management, LLC is a Nevada limited liability company.

6. Paddock carried out his mass attack on the concert from a room on the 32nd floor of the Mandalay Bay resort.

7. Following Paddock's attack, over 2,500 individuals ("Claimants") have brought lawsuits, or threatened to bring lawsuits, against Plaintiffs MGM Resorts Festival Grounds, LLC, MGM Resorts International, Mandalay Bay, LLC, Mandalay Resort Group, and MGM Resorts Venue Management, LLC (collectively, "the MGM Parties"), alleging that the MGM Parties (among others) are liable for deaths, injuries, and emotional distress resulting from Paddock's attack. Claimants subsequently voluntarily dismissed these cases before they could be resolved, apparently with the intent of refiling.

8. Named as defendants in this case are Claimants who have brought lawsuits (which they subsequently voluntarily dismissed) against the MGM Parties, alleging claims arising from Paddock's attack, and persons who, through counsel, have threatened to bring such claims against the MGM Parties.

9. Congress has enacted legislation to support the development of new technologies and services to prevent and respond to mass violence. That legislation, the Support Anti-Terrorism by Fostering Effective Technologies Act of 2002, 6 U.S.C. §§ 441-444 (also known by the acronym, the "SAFETY Act"), provides a calibrated balance of remedies and limitations on liabilities arising from mass attacks committed on U.S. soil where services certified by the Department of Homeland Security were deployed.

10. In the case of Paddock's mass attack, certified technologies or services were deployed by a professional security company, Contemporary Services Corporation ("CSC"), which was employed as the Security Vendor for the Route 91 concert. As alleged in more detail below, Paddock's mass attack meets the requirements of the SAFETY Act as set forth in the statute and the Regulations promulgated by the Department of Homeland Security.

11. Defendants' actual and threatened lawsuits implicate the services provided by

CSC because they implicate security at the concert, for example security training, emergency response, evacuation, and adequacy of egress.

12. As a result, the SAFETY Act applies to and governs all actions and any claims arising out of or relating to Paddock's mass attack. There are five key aspects of the Act and implementing regulations promulgated by the Department of Homeland Security as authorized and contemplated by the SAFETY Act. 6 C.F.R. § 25.1 et seq.

13. First, the SAFETY Act creates a "Federal cause of action for claims arising out of [or] relating to" an act of mass violence where certified services were deployed and where such claims may result in losses to the Seller of the services. 6 U.S.C. § 442(a)(1).

14. Second, the SAFETY Act expressly provides the federal courts with "original and exclusive jurisdiction over all actions for any claim for loss" arising out of or related to such an attack. 6 U.S.C. § 442(a)(2).

15. Third, as confirmed by the Secretary's implementing regulations promulgated after enactment of the SAFETY Act, the federal cause of action created by the statute is the exclusive claim available in such circumstances. 6 U.S.C. § 442(a)(1). The regulations state: "There shall exist only one cause of action for loss of property, personal injury, or death for performance or non-performance of the Seller's Qualified Anti–Terrorism Technology in relation to an Act of Terrorism." 6 C.F.R. § 25.7(d).

16. Fourth, the regulations further provide that "Such cause of action may be brought only against the Seller of the Qualified Anti–Terrorism Technology and may not be brought against the buyers, the buyers' contractors, or downstream users of the Technology, the Seller's suppliers or contractors, or any other person or entity." 6 C.F.R. § 25.7(d).

17. Fifth, to ensure compensation for victims in appropriate cases, the SAFETY Act

requires that the Seller "obtain liability insurance of such types and in such amounts as shall be required in accordance with this section and certified by the Secretary to satisfy otherwise compensable third-party claims arising out of, relating to, or resulting from an act of terrorism." 6 U.S.C. § 443(a)(1).

18.  Congress enacted the SAFETY Act in recognition of the strong national interest in encouraging the development and use of technologies and services that can help prevent and respond to mass violence. The Act does so in part by assurance of limited liability in the unfortunate event that an incident of mass violence occurs and injuries occur despite the deployment of such technology. The Act also does so by creating original and exclusive jurisdiction for the resolution of all controversies in federal court. 6 U.S.C. § 442(a)(2).

19.  The SAFETY Act expressly provides the federal courts with original and exclusive jurisdiction over "all actions for and any claims for loss [or] injury" arising out of or relating to a mass attack where certified services were provided and where such claims *may* result in losses to the seller of those services. The Act and the associated regulations make clear that any such claim against the MGM Parties must be dismissed.

20.  By this action, the MGM Parties seek a declaratory judgment and further relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the MGM parties cannot be held liable to Defendants for deaths, injuries, or other damages arising from Paddock's attack.

## PARTIES

### A. PLAINTIFFS

21.  Plaintiff MGM RESORTS INTERNATIONAL is a Delaware corporation with its principal place of business in Las Vegas, Nevada. Plaintiff MGM RESORTS

INTERNATIONAL is a citizen of Delaware and Nevada for purposes of diversity jurisdiction.

22. Plaintiff MANDALAY RESORT GROUP is a Nevada corporation with its principal place of business in Las Vegas, Nevada. Plaintiff MANDALAY RESORT GROUP is a citizen of Nevada for purposes of diversity jurisdiction.

23. Plaintiff, MANDALAY BAY, LLC is a Nevada limited liability company with a single member, Mandalay Resort Group. Plaintiff MANDALAY BAY, LLC is a citizen of Nevada for purposes of diversity jurisdiction.

24. Plaintiff MGM RESORTS FESTIVAL GROUNDS, LLC is a Nevada limited liability company with a single member, Mandalay Resort Group. Plaintiff MGM RESORTS FESTIVAL GROUNDS, LLC is a citizen of Nevada for purposes of diversity jurisdiction.

25. Plaintiff MGM RESORTS VENUE MANAGEMENT, LLC is a Nevada limited liability company with a single member, MGM Resorts International. Plaintiff MGM RESORTS VENUE MANAGEMENT, LLC is a citizen of Nevada and Delaware for purposes of diversity jurisdiction.

### B. DEFENDANTS

26. Plaintiffs are informed and believe and thereon allege that Defendant Robert Eardley is a citizen of the State of Utah. Defendant has, through counsel, asserted or threatened to assert claims against Plaintiffs based upon the October 1, 2017, shooting incident in Las Vegas, Nevada.

27. Plaintiffs are informed and believe and thereon allege that Defendant Laura Farthing is a citizen of the State of Utah. Defendant has, through counsel, asserted or threatened to assert claims against Plaintiffs based upon the October 1, 2017, shooting incident in Las Vegas, Nevada.

28. Plaintiffs are informed and believe and thereon allege that Defendant Jen Holub is a citizen of the State of Utah. Defendant has, through counsel, asserted or threatened to assert claims against Plaintiffs based upon the October 1, 2017, shooting incident in Las Vegas, Nevada.

29. Plaintiffs are informed and believe and thereon allege that Defendant Sheila Keele is a citizen of the State of Utah. Defendant has, through counsel, asserted or threatened to assert claims against Plaintiffs based upon the October 1, 2017, shooting incident in Las Vegas, Nevada.

30. Plaintiffs are informed and believe and thereon allege that Defendant Kelli Sanchez is a citizen of the State of Utah. Defendant has, through counsel, asserted or threatened to assert claims against Plaintiffs based upon the October 1, 2017, shooting incident in Las Vegas, Nevada.

## JURISDICTION AND VENUE

31. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 6 U.S.C. §442(a). As alleged hereinabove, the SAFETY Act expressly provides for original and exclusive federal jurisdiction over actions arising from or relating to acts of mass violence where technologies or services certified by the Secretary of Homeland Security were deployed. At the time of Paddock's mass attack at the Route 91 concert, security services were provided by Contemporary Services Corporation as the Security Vendor for the Route 91 Harvest Festival. CSC's security services were certified by the Secretary of Homeland Security under the SAFETY Act.

32. In addition, the Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 in that Plaintiffs (by virtue of their incorporation and principal places of business or membership)

are citizens of the States of Delaware and Nevada; Defendants are citizens of the State of Utah; and as to some Defendants, the matter in controversy exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C. § 1332(a). As to Defendants whose claims individually do not meet the amount-in-controversy threshold of 28 U.S.C. § 1332(a), this Court has supplemental jurisdiction over such claims under 28 U.S.C. § 1367 because those claims are so related to claims of parties whose claims do meet the amount-in-controversy threshold of 28 U.S.C. § 1332(a) that they form part of the same case of controversy under Article III of the United States Constitution, because all claims arise out of the same occurrence, viz., the mass attack perpetrated by Stephen Paddock at the Route 91 Harvest Festival in Las Vegas on October 1, 2017.

33. This Court has personal jurisdiction over Defendants because they are citizens of the State of Utah and are therefore subject to the general jurisdiction of this Court.

34. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b)(1) because, upon information and belief, one or more of the Defendants reside within this Judicial District.

### FIRST CAUSE OF ACTION FOR DECLATORY RELIEF
(By Plaintiffs against all Defendants)

35. Plaintiffs reallege and incorporate by reference, as though fully set forth, the allegations of paragraphs 1-34, above.

36. Following Paddock's mass attack on the concert, over 2,500 individuals have either sued the MGM Parties, or threatened to sue the MGM Parties, for claims alleged to arise from or relate to the attack. Several hundred individuals filed suit, and before the issues could be joined or resolved, they dismissed their claims, apparently with the intent of refiling.

37. Each Defendant either (a) has previously filed suit (and then dismissed it) against one or more of the MGM Parties relating to the Paddock attack, or (b) through counsel has stated an intention to sue the MGM Parties relating to the attack. There is no pending litigation between Plaintiffs and Defendants relating to the attack.

38. The claims alleged in the now-dismissed lawsuits include claims of alleged negligence by the MGM Parties and others, including CSC, in protecting and safeguarding persons including those Defendants who attended the Route 91 Festival.

39. Defendants' actual and threatened lawsuits implicate the services provided by CSC because they implicate security at the concert, including training, emergency response, evacuation and adequacy of egress.

40. These claims are subject to the SAFETY Act, because (a) they arise from and relate to an act of mass violence meeting the statutory requirements; (b) CSC provided security at the concert, deploying services certified by the Department of Homeland Security under the SAFETY Act to protect against or respond to such an attack; and (c) the claims may therefore result in loss to CSC as the "Seller" of such certified services.

41. The claims threatened against the MGM Parties by certain Defendants, through counsel, also inevitably fall under the SAFETY Act for the very same reasons: (a) they arise from and relate to an act of mass violence meeting the statutory requirements; (b) CSC provided security at the concert, deploying services certified by the Department of Homeland Security under the SAFETY Act to protect against or respond to such an attack; and (c) the claims may therefore result in loss to CSC as the "Seller" of such certified services. If Defendants were injured by Paddock's assault, as they allege, they were inevitably injured both because Paddock fired from his window *and* because they remained in the line of fire at the concert. Such claims

inevitably implicate security at the concert—and may result in loss to CSC.

42. The SAFETY Act applies to claims "arising out of, relating to, or resulting from an act of terrorism."

43. The SAFETY Act defines an act of terrorism: An act meets the requirements if the act is (i) "unlawful" (ii) "causes harm to a person ... in the United States," and (iii) "uses or attempts to use ... weapons ... designed or intended to cause mass ... injury." 6 U.S.C. § 444(2)(B). There is no requirement in the statute or regulations of an ideological motive or objective for the attack for it to meet the requirements of the SAFETY Act.

44. Paddock's mass attack satisfies the requirements of the SAFETY Act and the regulations: (i) it was "unlawful," (ii) it resulted in death or injury to hundreds of persons in the United States, and (iii) it involved weapons and other instrumentalities that were designed and intended to cause, and which in fact caused, mass injury and death. Those weapons and instrumentalities included rifles modified with bump stocks to spray fully automatic gun fire; high-capacity magazines capable of holding between 60 and 100 rounds; and illegal incendiary rounds intended to blow up the fuel tanks adjacent to the concert. Paddock used these weapons and instrumentalities to fire hundreds of rounds at the crowd, and he fired incendiary rounds which struck the fuel tanks but, fortunately, missed the fuel.

45. The post-attack investigation revealed that Paddock brought in his van, which he parked in the hotel garage, 90 pounds of explosives, consisting of 20 two-pound containers of exploding targets, 10 one-pound containers of exploding targets and 2 twenty-pound bags of explosive precursors.

46. No MGM Party attempted to commit, knowingly participated in, aided, abetted, committed, or participated in any conspiracy to commit any act of terrorism of criminal act

related to mass attack perpetrated by Stephen Paddock at the Route 91 Harvest Festival in Las Vegas, Nevada, on October 1, 2017.

47. The Secretary of Homeland Security may make a determination that conduct in question meets the statutory requirement, but neither the Act nor the regulations requires a formal certification. The Statute provides that the Secretary shall have exclusive authority to certify services, but the authority to determine whether an act of mass violence meets the statutory requirements is not exclusive to the Secretary.

48. Public statements by the Secretary of Homeland Security concerning the attack make clear that the attack meets the requirements of the SAFETY Act; indeed, based on the plain language of the statute, the regulations, and the facts, no other determination could be possible.

49. In congressional testimony on November 30, 2017, the Acting Secretary of Homeland Security noted the emphasis of "terrorists and other violent criminals … on attacking soft targets," including "recent tragedies in Nevada." The Acting Secretary went on to note that the "SAFETY Act Program" "provide[s] critical incentives for the development and deployment of anti-terrorism technologies by providing liability protections for 'qualified anti-terrorism technologies,'" which applies to a number of large sports and entertainment venues nationwide.

50. In a May 2018 release, Department of Homeland Security noted that "mass shootings" in various places, including at a "concert," aim "to kill and maim unsuspecting individuals" and thereby fall within the Department's "primary mission" "to prevent terrorist attacks within the U.S, reduce the vulnerability of the U.S. to terrorism, and minimize the damage and assist in the recovery from terrorist attacks that do occur, including those in ST-CPs [soft-targets-crowded places]." Department of Homeland Security, *Soft Targets and Crowded Places Security Plan Overview*, May 2018, at page 2. The report goes on to note that the

protections of the SAFETY Act have been "approved for open venues such as sports arenas and stadia" – such as the venue for the Route 91 Festival. *Id.* at p. 17.

51. The Department continues its critical work to prevent and respond to mass violence. In Congressional testimony on May 15, 2018, the Secretary testified that DHS is "seeking to ramp up 'soft target' security efforts," noting that DHS programs "address threats to soft targets – including schools, *entertainment venues*, major events, and public spaces" (emphasis added). Further, on June 4, 2018, DHS announced that it had "developed a ST-CP Security Enhancement and Coordination Plan," which has not been made public. The plan addresses "the increased emphasis *by terrorists* and other extremist actors to leverage less sophisticated methods to inflict harm in public areas ... such as parks, ... *special event venues*, and similar facilities." See https://www.dhs.gov/publication/securing-soft-targets-and-crowded-spaces (emphasis added).

52. The SAFETY Act creates a single, exclusive federal cause of action for claims for injuries arising out of or relating to acts of mass violence where services certified by the Department of Homeland Security were deployed in defense against, response to, or recovery from such act and such claims result or may result in loss to the Seller.

53. Pursuant to the SAFETY Act, the Department of Homeland Security has certified the services provided by CSC. The DHS Certification recognizes CSC's security services as appropriate for preventing and responding to acts of mass violence. 6 U.S.C. § 441; *see also* 48 C.F.R. § 50.201.

54. CSC's security services Certified by DHS include "Physical Security"; "Access Control"; and "Crowd Management."

55. CSC's Certified Crowd Management Services include:

- "Awareness of venue-specific emergency response protocols and evacuation procedures to include emergency alert and mass-notification systems and sheltering procedures";

- "Pre-event venue / event safety inspections";

- "Facilitation of crowd movement during ingress, circulation, sheltering in place, emergency evacuations, and egress";

- "Pre-event coordination and multi-agency collaboration with public safety agencies";

- "Selection, vetting, and training of employees."

56. As alleged above, CSC was employed as the Security Vendor for the Route 91 concert. CSC's responsibilities at the Route 91 Harvest Festival included providing the following DHS Certified Services:

- "perimeter security, event access, festival grounds event security";

- "Staff[ing] inner perimeter and gates";

- "Protect[ing] against unauthorized access";

- "early warning … of perimeter breaches";

- "Secur[ing] internal festival grounds";

- "Patrol[ing] festival floor grounds and assist[ing] patrons with any security related issues";

- pre-event planning for "Security and Safety";

- "Emergency response" and "evacuation," including evacuation for "terrorist threat" and "ensur[ing] that the exit routes and gates remain unobstructed."

57. For the reasons set forth above, the SAFETY Act creates an exclusive cause of

action for any claims arising out of relating to Paddock's mass attack and such claims may result in loss to the Seller. Under the SAFETY Act, there "shall exist only one cause of action for loss of property, personal injury, or death. 6 C.F.R. §25.7 (d).

58.   Such cause of action "may be brought only against the Seller of the Qualified Anti-Terrorism Technology and may not be brought against the buyers, the buyer's contractors, or downstream users of the Technology, the Seller's suppliers or contractors, or any other person or entity." 6 C.F.R. §25.7 (d). The SAFETY Act precludes any liability on the part of Plaintiffs to Defendants relating to Paddock's mass attack.

59.   In addition, the SAFETY Act provides that for any covered claims arising out of or relating to an act of mass violence where certified services were provided, "the government contractor defense applies in such a lawsuit," which provides a complete defense to liability. 6 U.S.C. §442(d)(1). The government contractor defense precludes any finding of liability on the part of Plaintiffs to Defendants relating to Paddock's mass attack.

60.   An actual and justiciable controversy exists between Plaintiffs and Defendants concerning the applicability of the SAFETY Act. Plaintiffs assert that the SAFETY Act precludes any liability for any claims arising out of or relating to Paddock's mass attack, whereas, on information and belief, Defendants deny that the Act applies or that it precludes liability on their claims against Plaintiffs.

61.   A judicial declaration as to whether the SAFETY Act applies and precludes liability on Defendants' claims against the Plaintiffs is necessary at this time so that the parties may ascertain their rights, and avoid the significant judicial waste that would occur if the lawsuits were allowed to proceed in the absence of a finding as to the applicability of the SAFETY Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs MGM Parties pray for judgment against Defendants, and each of them, as follows:

1. For a judicial declaration that:

   a. Defendants' claims arising from the attack by Stephen Paddock on October 1, 2017 in Las Vegas, Nevada are subject to and governed by the SAFETY Act, 6 U.S.C. § 441 et seq.;

   b. the SAFETY Act precludes any finding of liability against Plaintiffs for any claim for injuries arising out of or related to Paddock's mass attack, without prejudice to Defendants' rights to pursue claims against the "Seller" under the Act, including to obtain proceeds of insurance that any such Seller was required by the Act to maintain;

   c. Plaintiffs have no liability of any kind to Defendants, or any of them, arising from the Paddock's mass attack; and

2. For such other and further legal or equitable relief as the Court deems just and proper.

Dated: July 17, 2018

Respectfully submitted,

By: /s/ Scott D. Sweeney

Scott D. Sweeney
State Bar No. 15070
WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
1225 17th Street, Suite 2750
Denver, CO 80202
Tel: 303.572.5300/Fax: 303.572.5301
scott.sweeney@wilsonelser.com

ATTORNEYS FOR PLAINTIFFS MGM RESORTS INTERNATIONAL, MANDALAY RESORT GROUP, MANDALAY BAY, LLC, MGM RESORTS FESTIVAL GROUNDS, LLC, and MGM RESORTS VENUE MANAGEMENT, LLC